Filed 12/23/24  In re T.H. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re T.H., a Person Coming Under the Juvenile Court Law. | |
| SOLANO COUNTY HEALTH AND SOCIAL SERVICES DEPARTMENT,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>W.T.,<br><br>        Defendant and Appellant. | A170685<br><br>(Solano County<br> Super. Ct. No. J45474) |

W.T., father,[1] appeals from juvenile court orders denying his Welfare and Institutions Code section 388 petition[2] and terminating his parental rights to T.H. (minor) pursuant to section 366.26.  W.T. contends the juvenile court (1) abused its discretion in denying his section 388 petition; (2) erred in declining to apply the beneficial parent-child relationship exception to termination of parental rights; and (3) erred in ruling the Indian Child

---

[1] Mother is not a party to this appeal.

[2] All further statutory references are to the Welfare and Institutions Codes unless otherwise indicated.

1

Welfare Act (ICWA; 25 U.S.C. § 1901 et seq.) is inapplicable because the court and the Solano County Health and Social Services Department (Department) failed to comply with the inquiry requirements of ICWA.

The Department concedes the asserted ICWA error, and limited remand is appropriate to ensure ICWA compliance. In all other respects, we affirm.

## BACKGROUND

After mother tested positive for methamphetamines during her pregnancy and at birth, the Department filed a section 300 petition alleging a failure to protect (§ 300, subd. (b)). In March 2022, mother submitted on the allegation, and the juvenile court sustained the petition and took jurisdiction over newborn minor. Mother was unsure of the identity of the father. Although she listed her current boyfriend E.C. on minor's birth certificate, mother was pregnant before she met E.C., and she thought her ex-boyfriend W.T. might be the father.

After the jurisdiction hearing but before the six-month hearing, the Department located W.T. (hereinafter father).

In its six-month review report, the Department recommended continued reunification services for mother. It also recommended father be elevated to "presumed father" status and be provided with reunification services.

The Department reported father wanted minor returned to his care and had started visitation in August 2022. Father had been homeless for eight months but was temporarily living with his girlfriend, and the two were trying to find an apartment. Minor, now eight months old, had been placed

2

with a maternal relative[3] since he was two weeks old, and he was "developmentally on target."

In an addendum report, the Department stated father was living with his girlfriend and her father, but he was worried that if his girlfriend's father learned he had "fathered a child," it could "jeopardize" his housing situation. He requested support regarding housing resources. He worked two part-time jobs and was "open to taking parenting education classes." Father's case plan objectives included obtaining and maintaining stable and suitable housing, parenting education classes, and twice weekly supervised visitation.

At the six-month review hearing, the court found father was "not presently able to care" for minor, and it would be detrimental to minor to return him to father. The court granted father reunification services and set the matter for a 12-month review hearing.

In its 12-month review report, the Department recommended continued reunification services for father. Father and his girlfriend had been asked to leave her father's residence and the two were currently renting a room but were unable to have minor live with them. Father had been referred to three programs: Family Navigator Services with an assigned case manager to help him locate low-income housing; Bringing Families Home, which would assist him with a move-in deposit and temporary rental assistance; and Family Preservation services. In following up, the Department left a voicemail message with and sent an e-mail message to the case manager at Family

_____

[3] It is unclear from the record whether minor was placed with the maternal great-aunt, the maternal aunt, or the maternal cousin, as all three titles are used. Regardless, there is no dispute minor remained in the same placement for the entirety of the dependency proceedings, except for a two-week period when he was initially removed from mother. We refer to the relative as the caregiver or care provider.

Navigator Services but had not received a response. A social worker at Bringing Families Home stated she had attempted to contact father, but his phone was not accepting calls and that father needed to complete their application to receive rental assistance. The social worker provided father with the social workers' contact information, and he confirmed he had the information and would reach out. The child welfare supervisor at Family Preservation Services stated they would be closing father's referral due to his nonresponsiveness and the Department would have to submit another referral on father's behalf. On inquiry by the social worker, father agreed to reach out to inquire about keeping his referral open.

Father was largely in compliance with his parenting education, needing to complete one missed class.

Father participated in weekly two-hour supervised visits and had progressed from "supervised to monitored" visitation. Father sometimes needed assistance feeding and changing minor and "instructions on how and when to provide" minor with medicine when he was sick with a cold or teething. Additionally, the care provider "expressed concern" during two visits because father's girlfriend "did all of the feeding and changing of [minor's] diaper." The social worker spoke to father who agreed to "take more responsibility for meeting his son's basic needs." During one visit, minor appeared "pleasant" throughout the visit and "seemed to enjoy the interaction." At another time, he was described as being "distracted." But father "did well with playing" with and engaging minor.

The court found father's progress toward alleviating the causes necessitating placement was "adequate," continued minor's out-of-home

placement, ordered six more months of reunification services, and set the matter for an 18-month review hearing.[4]

In its 18-month review report, the Department recommended termination of reunification services for father.  Father had made "adequate" progress in his case plan but the Department was concerned father had not progressed past monitored visitation.  Additionally, although father completed parenting education and could communicate what he learned, he "struggle[d] with demonstrating" his lessons during visits and had also not demonstrated he could meet minor's "basic needs."

For example, the care provider shared that one time minor "had dried feces on his behind" and another time minor had a rash.  Father stated he was "unaware of this and that the [care provider] does not give him much insight into how to meet his son's needs."  The provider stated that she helps father by "telling him the essential things to pack in [minor's] diaper bag, his favorite foods," and what toys he likes.  And, at the May 1 visit, she showed father how to give minor medicine and how to provide minor "with his breathing machine treatment and inhaler."

At an unmonitored May 8 visit, father once again did not have a diaper bag or snacks for minor and came to the care provider's house "asking for two juices and a snack for [minor] and some food for himself."  The social worker relayed the concerns to her supervisor who agreed visitation should remain monitored until father could "demonstrate that he can meet his son's basic

---

[4] After mother submitted on the allegation in the section 300 petition, she did not otherwise participate in the proceedings.  Since the jurisdiction/disposition hearing, mother had not been in contact with the Department, and her whereabouts remained unknown.  At the 12-month review hearing, with mother's whereabouts still unknown, the court terminated her reunification services.

needs, such as having nutritional snacks, drinks, and diapers prior to his scheduled visitation." The social worker also expressed to father the importance of attending minor's doctor's appointments so that he had an understanding of minor's heart condition. The social worker had provided father with all of minor's medical and dental appointments via text message and face-to-face. At the June 16 visit, father was continuing to use the supplies the care provider had bought for minor. The following week, at the June 23 visit, which occurred at the child welfare office, father and minor watched a child-friendly show on father's cell phone and father was "loving and nurturing," while minor "smiled often." However, father did not change minor's diaper, and although he brought a can of food and a snack for minor, he did not try and feed minor until the end of the visit and he did not bring a plate or utensils.

Father had not yet secured stable housing for himself and minor, but reported he could live with his stepmother. The stepmother's home did not have space for father and minor, but the social worker attempted to reach out to the stepmother "numerous" times to see if "arrangements could be made in the home for [minor] to reside there." However, the stepmother's work schedule made contacting her difficult. Father then reported he would look for his own apartment. He stated he had received four referrals for "apartment leads" from a case manager, but two were for elderly residents and the other two were disconnected. Father was currently at the top of the section 8 housing waitlist, but he had missed his "appointment date and [the] time had expired." The social worker informed father "he would be provided with another appointment via a letter in the mail."

At the contested 18-month review hearing, the court terminated reunification services and set the matter for a selection and implementation

6

hearing pursuant to section 366.26. After the court terminated services, counsel requested father "continue to be informed of when [minor's] doctor's appointments are set. It's my hope that he will be able to make arrangements to attend those in the future." The court granted the request. Additionally, the parties stipulated father would receive an additional three visits (four visits total) per month. Finally, the court told father, "You really are trying, and I saw all the effort that you put into reunifying with your son." But, continued the court, "[t]here's some things that you know you need to kind of wrap up." First, "[h]ousing is huge. . . . [¶] . . . [¶] Your current situation is just not appropriate for a young child." Second, father needed to show he could meet minor's basic needs. The court stated, "I mean, babies and little kids, they're just—they're hard. You know, they require attention, they require changing, they require—you just simply being aware of what's happening with them, what they need at every moment. . . . [¶] . . . They're always hungry, or they're always needing something. So you have to be sort of prepared and anticipate what they're going to need or want and be ready to provide it."

In its section 366.26 report, the Department recommended the trial court terminate father's parental rights and select adoption as the permanent plan. The Department noted minor, now two years old, "expresses love and affection towards [father]" during visits, but he "does not express sadness" or "react negatively" when visits end. Although minor would run up to father, he would also "[run] up to his caregiver and [was] ready to leave with her at the end of visits." Additionally, father still struggled to meet minor's needs during visitation, relying on the caregiver for diapers/wipes and food. During the reporting period, father did not take advantage of the allowable additional visitation, and instead maintained monthly visitation. In sum,

7

adoption outweighed any potential detriment of termination of parental rights. Minor was "very attached to the current caregiver," who was committed to adoption and was able to meet minor's needs, including attending appointments to monitor minor's heart murmur and his weekly speech therapy appointments.

At the section 366.26 hearing,[5] counsel stipulated minor was generally and specifically adoptable. The court confirmed it had read and reviewed the section 366.26 report and then heard from the social worker and father.

The social worker, an expert in "child welfare and specifically in permanency assessment," testified father was allowed a minimum of one visit per month but the court made a provision allowing for an additional three visits starting in October 2023. At the time of the hearing, father had not availed himself of the additional visitation. Father had not attended any medical visits, as far as the social worker was aware, nor had he "asked [her] about medical appointments." The social worker confirmed, by reviewing text messages, that the care provider had sent father the dates and times of the medical appointments, and she would also send a "summary of what happened during the appointment when he didn't attend." Occasionally, father would request the summary but sometimes the care provider would just send it. At the observed visit, when minor saw father he smiled and "[t]hey gave each other a hug." The social worker was unable to observe the end of the visit, because father had arrived late, and she had to leave before the end of visitation.

---

[5] After the Department filed its section 366.26 report, but before the court held the hearing, father filed a section 388 petition, which the trial court denied. We discuss the section 388 petition later in the opinion.

8

Father testified that after reunification services were terminated, he "thought [his] rights was terminated, so [he] didn't really think [he] had the choice to have more visitation at that time." Father further explained he is from Boston and does not have family in California and must "pay a Lyft to get" to visitation or "ask somebody for a ride." He worked five days a week, from 7:00 a.m. to 3:30 p.m., which also made it hard to schedule visits. At visitation, minor would laugh and smile, and "in that instant, like he already knew who I was. Yeah, like, his whole world was towards me. . . . And it was the same here, you know, it was mutual." Father thought minor was "[v]ery attached," and during visits, minor "doesn't want to leave my side at all. He constantly holds my hand. Yeah, I can just tell he loves my presence and he knows that I'm his dad, you know, so it's definitely a great feeling." At the end of the visits, minor "would cry. It really hurted me a lot. Yes, he will cry. And I could tell he doesn't want me to go. He's very emotional." The care provider told him minor had a speech delay and autism. Father also had a speech delay growing up and thought minor would need "a one-on-one type of learning." Father thought minor "reacts pretty well from the food" he brought during visits. He initially brought food others had given him, but after a while, he "switched it up and [he] started bringing different food."

On cross-examination, father stated he did not understand from the prior hearing that he had additional visitation, and he denied speaking to the social worker about additional visits. Father did not know any of minor's medical care providers, had never asked for the information, and was not "100-percent sure" of some of the services minor received. He also acknowledged the Department had offered to provide "Uber rides to [his] visitation," and he was aware that was an option if he needed a ride.

The social worker testified she had heard of minor crying at the end of only one visit and that "was due to him not wanting to leave the park and wanting to run back inside and play." "I do know that after most visits, the father is able to put [minor] in his car seat, and that visits usually end without incident because of this arrangement." The care provider had informed the social worker minor "was clingy" on one occasion, but that was not "typical behavior." Further, minor was "sometimes . . . pretty hungry and thirsty after a visit."

The social worker did not observe minor call father " 'dada,' " as father claimed, and the care provider never mentioned that happening. The care provider had heard minor use the word " 'dada,' " "when mimicking her two daughters in the home, who refer to her brother as 'dada.' " The social worker stated it was clear how much father "loves and cares for [minor]," however, her recommendation that parental rights be terminated remained unchanged.

Counsel for the Department acknowledged the work father had done to date and expressed there was "no doubt that father loves [minor] and he deeply cares for him." But father had not met his burden of showing the beneficial parent-child exception to termination applied. Counsel argued father had not shown regular visitation. While father maintained the minimum visits, he did not take advantage of additional visitation. Indeed, father had not reached out to schedule or even inquire about additional visits, despite the previous court hearing where this was discussed. Father also failed to show there was a significant, positive, emotional attachment, the kind from which minor would benefit from a continuing relationship. Rather, the relationship was more "of a friendly visitor," and while minor was "certainly happy to see father and eager to play and visit with him the once-

10

a-month he gets to visit with him," this "does not rise to the level of a substantial or an emotional attachment." Minor, at two years old, had been placed with his current care giver since he was two weeks old. Father still continued to "lack knowledge regarding [minor's] basic needs, including his medical needs, which are now more extensive." Finally, father had not shown termination of rights would be detrimental. Minor had stability with his current care provider, who was willing and able to meet his needs, including regular appointments for minor's heart murmur.

Father's counsel argued father believed his rights had already been terminated, "yet he persisted and continued to improve his housing and reach out for visitation" to the extent he thought he could visit. Minor "reacted positively to [father], was warm, and greeted [father] with warmth and smiles." Father experienced "similar struggles" as minor, having had "an IEP" and a "heart murmur growing up, as well as a speech delay." And, "[h]aving that personal understanding and knowledge . . . would be extremely beneficial to [minor]." Further, terminating rights "would cut off [minor] from ever having [an] opportunity to connect with the paternal side of his family." Mother's counsel joined with father's counsel and asked the court to adopt a permanent plan of guardianship and not terminate parental rights.

Minor's counsel asked the court to terminate rights and select adoption as the permanent plan. Minor was currently getting speech classes, socialization classes, and was going to "be getting behavioral services and OT services," all of which "requires a lot of time and advocacy." Counsel did not think father was "in a position to provide this for him." Additionally, increased visitation had been brought up again at the prior hearings, and father had not reached out regarding visitation or medical appointments.

11

Observing that additional visitation had been agreed-on by the parties when reunification services were terminated, and father was present when that took place, the court was unsure why father believed his visits had been terminated. Nonetheless, the court found father had regularly visited minor. However, the court found father's lack of awareness about his allowable additional visitation spoke to his "disorganization or his comfort in the minor being with the care-provider, his lack of urgency in maybe putting his son and this case first, as a priority." The same could be said of father's lack of involvement with minor's medical appointments, of which father was aware. Taking into consideration father's failure to increase visitation and his lack of involvement in minor's medical care, the court found there was no substantial positive relationship. While the court acknowledged father and minor had a "good time at the visits," minor was two years old and had spent "almost all [of] his life" with his care provider with whom he was "very attached." The court therefore concluded the "stability that adoption will provide to [minor], the stability of the home where he is and has been most of his life, is beneficial to him and outweighs any detriment that the termination of parental rights would provide."

The court terminated parental rights and ordered adoption as the permanent plan.[6]

## DISCUSSION

### *Section 388 Petition*

In advance of the section 366.26 hearing, father filed a section 388 petition requesting an additional six months of reunification services. Father stated he had obtained stable and secure housing, established a local support

---

[6] At the time of the section 366.26 hearing, mother's whereabouts remained unknown, and the court terminated her parental rights.

12

network, maintained stable employment, and was taking steps to obtain a driver's license.[7]

At a hearing on the matter, the Department asserted "there was more than just housing preventing [father] from reunifying with [minor.]" Other concerns were that father could not meet minor's basic needs. Minor has a heart condition and a speech delay, yet father had failed to attend minor's medical appointments. Additionally, the care provider continued to have to provide supplies for minor during visitation. Finally, father had maintained only once-per-month visitation despite the court approving three additional visits per month. And, with regard to the "visits there have been," father was sometimes a "no-show or did not call to cancel visits or has been arriving late."

Minor's counsel joined with the Department, adding minor has also been diagnosed with autism, and "father has not shown that he's able to attend all of his appointments and stay on top of that."

Counsel for father maintained circumstances had changed. Father had gone from living in a house with eight other people and where he could not have minor to finding his own room, and "he has proper supplies for the minor to return safely to his care." Counsel acknowledged minor has been in his current placement for the majority of his life, but minor enjoys visits with father, and it would be in minor's "best interests . . . to keep that connection viable and allow that opportunity to see how much more it can grow and how much more support and stability he can gain from those additional six months of reunification services."

---

[7] Due to an accident when he was 12 years old, father is legally blind in one eye and did not drive or have a driver's license.

The court found there were "changed circumstances in terms of housing, stable employment, having the material needs for the minor, the bed, the utensils, etcetera, I see that change." But the court did not see the "change in circumstances in the understanding, in the recognition, in the active involvement in the minor's medical." It pointed out father's lack of involvement with minor's medical appointments. It also had "serious concerns" that father chose to visit minor only once per month.

Father's counsel responded that minor's health concerns were "recent diagnoses," and father was "unaware of the additional three visits a month . . . that were allowed to him."

While the autism diagnosis was recent, the court observed "the steps that it took to actually get to that diagnosis" were not recent and involved "a series of appointments and assessments." The court also pointed out additional visits had been discussed at the prior hearing at which father was present. The social worker had also reminded father about the additional visits in January and February, and father had still not taken advantage of them.

Accordingly, the court denied the request for further services. While the court commended father on his stabilized housing, it did not find a change in circumstances in father's involvement with minor's medical needs. Nor had father "taken advantage of all visitations that were offered to him."

A juvenile court order in a dependency proceeding may be changed, modified, or set aside if the petitioner establishes by a preponderance of the evidence (1) new evidence or changed circumstances exist, and (2) the proposed change would promote the best interests of the child. (§ 388; *In re Stephanie M.* (1994) 7 Cal.4th 295, 316–317 (*Stephanie M.*).) To satisfy the first prong, "the change in circumstances must be substantial." (*In re Ernesto*

14

*R.* (2014) 230 Cal.App.4th 219, 223.) Merely changing—as opposed to changed circumstances—will not suffice. (*In re Mickel O.* (2011) 197 Cal.App.4th 586, 615 (*Mickel O.*)) As to the second prong, specifically when determining whether reinstatement of reunification services is in the best interests of the child, as is the issue here, the juvenile court must consider whether "the specific factors that required placement outside the parent's home" have been remediated and prioritize "the goal of assuring stability and continuity" for the child. (*In re Angel B.* (2002) 97 Cal.App.4th 454, 463–464.)

We review the denial of a section 388 petition for abuse of discretion. (*In re Marcelo B.* (2012) 209 Cal.App.4th 635, 642, disapproved on other grounds as stated in *In re Caden C.* (2021) 11 Cal.5th 614, 637–638, fns. 6 & 7 (*Caden C.*)) " ' "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' " (*Stephanie M., supra,* 7 Cal.4th at pp. 318–319.)

On appeal, father focuses on obtaining housing and contends the "fact that he successfully obtained suitable housing for him and [minor] was a substantial change in his circumstances."

However, father's need for appropriate housing was not the only circumstance that had resulted in minor being placed outside the parent's home. It was equally due to father's difficulty in meeting minor's basic needs and his medical needs. Father reiterates that he did not become a party to the dependency proceedings until the six-month review hearing and that minor's autism diagnosis was recent. However, father received almost a year

15

of services.[8]  Further, the assessments and appointments that led to the autism diagnosis had occurred over time, and even by the time services were terminated, father was still not attending minor's medical appointments. Along with autism, minor had also been diagnosed with a heart murmur and speech delays, and father was unsure of what services minor was attending or needed to address those conditions.  Additionally, father had not progressed to unsupervised visitation, was still relying on the care provider for food and supplies for minor and was not attending the additional allowable visitation.

But even assuming a substantial change in circumstances, father has not shown the requested additional six months of reunification services would be in minor's best interests.  Father asserts an additional six months "would allow [him] to work out a schedule that would allow him to include attending appointments for [minor] and prepare them to transition for life together." But father had had a year to address deficiencies in meeting minor's basic needs and also his medical needs, and he could not show a substantial change in his ability to meet those needs.  In short, there is nothing to suggest that an additional six months would change father's deficiencies in this regard. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 310 ["While [the months that must pass before a section 366.26 hearing is held] may not seem a long period of time to an adult, it can be a lifetime to a young child.  Childhood does not wait for the parent to become adequate."].)[9]

---

[8]  Father started visitation with minor in August 2022.  The following month, the court elevated father to presumed father, and in October, the court ordered reunification services the following month.  Services for mother were terminated in April 2023, and services for father were terminated in September 2023.

[9]  Disapproved on another point as stated in *Nickolas F. v. Superior Court* (2006) 144 Cal.App.4th 92, 112.

"[A]fter reunification services have terminated, a parent's petition for . . . reopening reunification efforts must establish how such a change will advance the child's need for permanency and stability." (*In re J.C.* (2014) 226 Cal.App.4th 503, 527.) The petitioner bears the burden of showing both a legitimate change and that undoing the prior order would be in the best interest of the child. (*Mickel O., supra*, 197 Cal.App.4th at p. 615.)

Here, although father's circumstances were slowly changing in some respects, they were not yet substantially changed as they must be for purposes of a section 388 petition.

***Beneficial Parent-Child Relationship Exception***

The beneficial relationship exception to the termination of parental rights applies where "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) The parent must prove, by a preponderance of evidence, three things: "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Caden C., supra,* 11 Cal.5th at pp. 631, 636.) We review the first two elements for substantial evidence, and the third for abuse of discretion. (*Id.* at pp. 639–640.)

" 'The first element [of the exception]—regular visitation and contact— is straightforward. The question is just whether "parents visit consistently," taking into account "the extent permitted by court orders." ' " (*In re Katherine J.* (2022) 75 Cal.App.5th 303, 316 (*Katherine J.*).)

"The second element, in which the court must determine whether the child would benefit from continuing the relationship with [his or] her parent, is more complicated. '[T]he relationship may be shaped by a slew of factors,

17

such as "[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or, 'negative' effect of interaction between parent and child, and the child's particular needs." [Citation.]' (*Caden C., supra*, 11 Cal.5th at p. 632.) '[C]ourts often consider how children feel about, interact with, look to, or talk about their parents.' (*Ibid.*) *Caden C.* instructs us that 'it is not necessary—even if it were possible—to calibrate a precise "quantitative measurement of the specific amount of 'comfort, nourishment or physical care' [the parent] provided during [his or] her weekly visits." [Citation.]' (*Ibid.*) Expert opinions or bonding studies provided by psychologists who have observed and/or reviewed the parent-child relationship are often 'an important source of information about the psychological importance of the relationship for the child.' (*Id.* at pp. 632– 633, fn. omitted.) Ultimately, the court's role is to decide whether the child has a ' "significant, positive, emotional relationship with [the parent.]" ' (*Id.* at p. 633.)" (*Katherine J., supra*, 75 Cal.App.5th at pp. 316–317.)

"The third and final element asks the court to ascertain whether severing parental ties—and thus 'terminating [the] parental' relationship— would be detrimental to the child. (*Caden C., supra*, 11 Cal.5th at p. 633.) 'What courts need to determine, therefore, is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life.' (*Ibid.*) Because any harm caused by loss of this relationship may be significantly mitigated by the child's adoption into a stable, loving home, the court must then perform a delicate balancing act. The 'subtle, case-specific inquiry [that] the statute asks courts to perform [is]: does the benefit of placement in a new, adoptive home outweigh "the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with [the parent?]" ' (*Ibid.*)

18

'When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be "detrimental to the child due to" a child's beneficial relationship with a parent.' (*Id.* at pp. 633–634.)" (*Katherine J., supra*, 75 Cal.App.5th at p. 317, fn. & italics omitted.)

There is no dispute the trial court concluded father carried his burden as to the first element.

As to the second element—whether the child would benefit from continuing the relationship with the parent—father contends "[s]ubstantial evidence support[s] a finding that [minor] had a significant, positive, emotional attachment to father." Father points to the visitation notes, which from the "beginning of the case paint a picture of a loving and devoted first-time parent, doing everything he can to be the best father he can to his son." The notes, continues father, show minor enjoyed his visits with father and ran to father, "showing love and affection." Father also "successfully learned to feed [minor], change him, put him to sleep," and "engage" minor with play. He asserts minor's "lack of sadness" at the end of visits could "just as likely be indicative of . . . a toddler," who "has grown to depend and trust that he will always see his father on a regular basis," rather than "evidence of a lack of a beneficial relationship."

Minor was a newborn at the time he was removed and had lived almost his entire life with the care provider who wanted to adopt him and to whom he was attached. Minor never lived with father, and father had not progressed beyond monitored visitation which occurred on only a limited basis. While father was eventually able to change minor's diapers, bring snacks for him, and partially keep abreast of his developmental progress due to the care provider providing updates, it was the care provider who met

19

minor's physical, emotional, and psychological needs on a daily basis. Further, the care provider fed and clothed minor, took minor to medical appointments, and provided minor with a safe and stable environment. "Even frequent and loving contact is not sufficient to establish" the beneficial parental relationship exception, "absent a significant, positive emotional attachment between parent and child." (*In re I.R.* (2014) 226 Cal.App.4th 201, 213.) Here, while it is clear father loves minor, father has not met his burden of showing such a significant, positive attachment with minor.

Even assuming there was such a relationship between father and minor, father has not demonstrated loss of the relationship would be detrimental to minor "to an extent not outweighed, on balance, by the security of a new, adoptive home." (*Caden C., supra*, 11 Cal.5th at p. 634.) By the time of the termination hearing, minor was 27 months old, had been out of the home since birth, and had never lived with father. Minor had speech delays, autism, and a heart murmur, all of which required professional services and monitoring. Father had not attended minor's medical appointments and was unsure of the services minor was currently receiving. Terminating his parental rights did not result in detriment outweighing the stability and safety of minor's current placement.

Father additionally asserts minor's "community of origin" "was ignored by the Department," and it would be detrimental to minor to sever his connection to his paternal relatives. To begin with, this argument was, in fact, made and considered below. Further, the Department had said it would consider and, if appropriate, would arrange visitation with paternal grandparent and any relatives or non-related extended family members who came forward, and when the social worker later spoke to paternal uncle, who resided in Boston, she "encouraged [his] participation in virtual visits with

20

[minor] since he lives out of state and approved [father] to call [paternal uncle] during his time with [minor] if he wanted to further support that relationship." Thus, there is nothing in the record to suggest, and father does not contend, paternal relatives were in any way prevented from asking for visitation with minor.

The court reviewed the reports, heard testimony from father and the social worker, and heard arguments from counsel. The court correctly stated it was looking for "something more than just a good visit, something more than just the incidental benefits of having a relationship with the parent." Given all the circumstances, the court found "the stability that adoption will provide to [minor], the stability of the home where he is and has been most of his life, is beneficial to him and outweighs any detriment" of termination. As we have recited, this conclusion is amply supported by the record, and the juvenile court did not err or abuse its discretion in finding the beneficial parent-child relationship exception inapplicable.

## ICWA

In its detention report, the Department concluded ICWA was inapplicable based on mother's denial of Native American ancestry. At the detention hearing, counsel asked the court to defer making an ICWA finding. The court responded, "Okay. But there's no reason that I can see for the Department to have to do anything at this point." In the orders made after the hearing, the court determined ICWA did not apply, having found there was no reason to believe or to know minor was an Indian child. This finding was made before father entered the proceedings.

Later, in its jurisdiction/disposition report, the Department relied on the court's prior determination and stated ICWA did not apply. In the report, the Department also noted it had made inquiries of maternal grandparents

21

and both denied any knowledge of Native American ancestry. Additionally, the Department made an initial inquiry of father, who stated he has no known Native American ancestry. However, no inquiries were made of paternal relatives despite the Department obtaining the names, status, and last known location of paternal grandparents and great-grandparents. Importantly, there is no evidence the Department or the trial court inquired of any other paternal relatives, including paternal grandfather, who father stated could be contacted via social media; father's stepbrother, who attended court hearings; or father's stepmother or paternal uncle, who father identified as part of his support network.

The federal ICWA defines an " 'Indian child' " as a child who "is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4); *In re D.M.* (2024) 101 Cal.App.5th 1016, 1044, review granted July 24, 2024, S285537.) "Under ICWA's state analogue, the California Indian Child Welfare Act (Cal-ICWA; Welf. & Inst. Code, § 224 et seq.), courts and child welfare agencies are charged with 'an affirmative and continuing duty to inquire whether a child . . . is or may be an Indian child' in dependency cases. [Citation.] Child welfare agencies discharge this state law duty by 'asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled.' " (*In re Dezi C.* (2024) 16 Cal.5th 1112, 1125 (*Dezi C.*), quoting § 224.2, subd. (b); Cal. Rules of Court, rules 5.481(a) & 5.668(c).)[10] The initial duty of inquiry is "a

---

[10] " '[E]xtended family member' means 'a person who has reached the age of eighteen and who is the Indian child's grandparent, aunt or uncle,

22

bit of a misnomer." (*Dezi C.,* at p. 1132.) Because, although it " 'begins with the initial contact,' " the duty " 'continues throughout the dependency proceedings.' " (*Ibid.*)

"When the agency has 'reason to believe' that an Indian child is involved, further inquiry regarding the possible Indian status of the child is required. (§ 224.2, subd. (e); see also [Cal. Rules of Court,] rule 5.481(a)(4).) The required further inquiry includes (1) interviewing parents and extended family members; (2) contacting the Bureau of Indian Affairs (BIA) and State Department of Social Services; and (3) contacting tribes the child may be affiliated with and anyone else that might have information regarding the child's membership or eligibility in a tribe. (§ 224.2, subd. (e)(2)(A)–(C).)" (*Dezi C., supra*, 16 Cal.5th at pp. 1132–1133, fn. omitted.) "If the inquiry establishes a reason to know an Indian child is involved, notice must be provided to the pertinent tribes. (§ 224.3, subds. (a), (b); 25 U.S.C. § 1912(a).)" (*Id.* at p. 1133.)

"The juvenile court's factual finding that ICWA does not apply is 'subject to reversal based on sufficiency of the evidence.' " (*Dezi C., supra*, 16 Cal.5th at p. 1134, quoting § 224.2, subd. (i)(2).) Our Supreme Court has noted that a "juvenile court's fact-specific determination that an inquiry is adequate, proper, and duly diligent is 'a quintessentially discretionary function' [citation] subject to a deferential standard of review." (*Id.* at p. 1141.) The court's discretion depends upon the record before it: " ' "On a well-developed record, the court has relatively broad discretion to determine whether the agency's inquiry was proper, adequate, and duly diligent on the

---

brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent.' " (*Dezi C., supra*, 16 Cal.5th at p. 1132.)

23

specific facts of the case.  However, the less developed the record, the more limited that discretion necessarily becomes." ' " (*Ibid.*)

Here, as respondent acknowledges, the Department's inquiry extended no further than mother and father, even though father's stepbrother and stepmother, and paternal uncle and grandfather were readily available.  The Department made no further effort in contacting paternal relatives or helping father contact them, and its inquiry fell well short of compliance with section 224.2.  The juvenile court, in turn, continuously relied on the Department's initial inquiry and determination based solely on mother's responses.

" ' "When, as in this case, the court's implied finding that the agency's inquiry was proper, adequate, and duly diligent rests on a cursory record and a patently insufficient inquiry that is conceded, the only viable conclusion is that the finding is unsupported by substantial evidence and the court's conclusion to the contrary constitutes a clear abuse of discretion." ' " (*Dezi C., supra*, 16 Cal.5th at p. 1141.)

Because we conclude the juvenile court's implied finding that the Department's ICWA inquiry was adequate and proper is not supported by sufficient evidence and record documentation, we must conditionally reverse the juvenile court's termination of parental rights and remand the matter "to develop the record and cure the inadequacy." (*Dezi C., supra*, 16 Cal.5th at p. 1145.)

## DISPOSITION

The order denying father's section 388 petition is affirmed.  The order terminating father's parental rights is conditionally reversed and the matter is remanded for the limited purpose of complying with the inquiry and notice provisions of ICWA, as well as the requirements of sections 224.2 and 224.3

24

and the documentation provisions of California Rules of Court, rule 5.481(a)(5). If the juvenile court thereafter finds a further inquiry was proper and adequate, due diligence has been conducted, and concludes ICWA does not apply, the orders shall be reinstated. If, however, the juvenile court concludes ICWA applies, the juvenile court is ordered to conduct a new section 366.26 hearing and proceed in accordance with ICWA and California implementing provisions.

_____

Banke, J.

We concur:

_____

Humes, P.J.

_____

Hill, J.*

*Judge of the San Mateo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

A170685, In re TH